Filed 10/7/15  P. v. Weisner CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B251312 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No.BA382741) |
| v. | |
| JONQUIL WEISNER et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Robert Perry, Judge.  Affirmed.

Corona & Peabody, Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant Nesta Wellington.

Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant Jonquil Weisner.

David H. Goodwin, under appointment by the Court of Appeal, for Defendant and Appellant Julian Blackshire.

Kamala D. Harris, Attorney General, Gerald Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey and Zee Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

This case arises from the gang-related robbery and murder of Isaias Quinones, a bank guard. Nesta Wellington, Julian Blackshire, and Jonquil Weisner (collectively, appellants) appeal from their respective judgments entered following a jury trial in July 2013. Each appellant was convicted of first degree murder (Pen. Code, §187, subd. (a); count 1)[1], conspiracy to commit robbery (§182, subd. (a)/§211; count 2), and second degree robbery (§211; count 3). The jury returned true findings on the allegations that, as to counts 1 and 3, a principal personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (d) & (e)(1) and that, as to all counts, the crimes were committed for the benefit of or in association with a criminal street gang §186.22, subd.(b)(1)(C).)[2] Appellants were each sentenced to prison for a term of 50 years to life on count 1, consisting of 25 years to life for first degree murder, plus a consecutive term of 25 years to life for the firearm enhancement. On each of counts 2 and 3, the trial court imposed, and stayed the 5 year upper term, plus the 10 year gang enhancement. (§ 654.)

All three appellants contend the judgments must be reversed. Weisner and Blackshire contend the trial court committed reversible error by denying their respective motions for acquittal (§1118.1), because the only evidence of their culpability was the uncorroborated testimony of an accomplice. All appellants argue the trial court erred by quashing the defense subpoena to compel an uncharged accomplice to appear at trial and testify as a defense witness. Wellington also contends the trial court erred by refusing to provide funding for a defense eyewitness expert, and then refusing to allow the retained defense eyewitness expert to testify. Blackshire contends the trial court abused its discretion in admitting the irrelevant testimony of Ms. Guy, the mother of two prosecution witnesses. He also contends the prosecutor committed misconduct by first asking a witness whether Blackshire followed through on an alleged promise to speak to

---

[1] All further section references are to the Penal Code unless otherwise indicated.

[2] During Wellington's first trial in 2010, he was the sole defendant. The jury deadlocked, and the trial court declared a mistrial. On May 12, 2011, a grand jury indicted Wellington, as well as Weisner and Blackshire, on the above three counts.

police and by then arguing to the jury that his failure to speak to police demonstrated consciousness of guilt.

Wellington and Blackshire each challenge his sentence on the ground the trial court abused its discretion by refusing his request to postpone sentencing to enable the defense to prepare for sentencing. Wellington contends the court abused its discretion by denying his motions to continue sentencing in order to allow him to obtain evidence of potentially mitigating circumstances and to complete his new trial motion. Both Blackshire and Wellington, who were age 17 when the crimes were committed, contend a sentence of 50 years to life amounts to a de facto sentence of life without possibility of parole and therefore constitutes cruel and unusual punishment under the United States Constitution.

Each appellant joins in any contention made by any of the other appellants to the extent it is to his benefit. During the pendency of these appeals, the California Supreme Court decided *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*). In *Chiu*, the court held "an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine." (*Id*. at pp. 158-159.) The court explained although first degree and second degree murder share the common elements of an "unlawful killing of a human being with malice aforethought, . . . [first degree murder] . . . has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty"; "[t]hat mental state is uniquely subjective and personal"; and "the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine[.]" (*Id*. at p. 166.)

Weisner and Blackshire, but not Wellington, filed supplemental letter briefs addressing the applicability of *Chiu* to these appeals. Respondent filed a responsive supplemental letter brief, conceding instructional error in light of *Chiu* but arguing that it was harmless. Weisner filed a first and a second reply supplemental letter brief. Blackshire filed a reply brief in which he addressed respondent's contentions.

3

We affirm the judgments. The trial court did not err in denying the motions of Weisner and Blackshire for acquittal. The evidence corroborating the accomplice's testimony was substantial. The court properly quashed the defense witness subpoena, because the defense failed to carry its initial burden to establish that the evidence anticipated from the witness was relevant and material. Any error in the trial court's refusal to fund a defense eyewitness expert and to allow the retained expert to testify was harmless. The court did not abuse its discretion in allowing the mother of two prosecution witnesses to testify. The testimony from Ms. Guy was highly probative credibility of those three witnesses and its probative value outweighed any prejudice resulting from its admission. The trial court's admonition to the jury cured any prejudice flowing from the testimony elicited by the prosecutor that Blackshire failed to speak with the police about a murder after agreeing to do so. Even if Blackshire's failure to object to the prosecutor's argument that he did not go to the police station did not amount to forfeiture, the prosecutor's comment was non-prejudicial in view of the court's earlier admonition, which the jury is presumed to have followed.

Respondent properly conceded that the trial court erred in instructing the jury that Weisner and Blackshire could be found guilty of first degree murder as aiders and abettors of that crime under the natural and probable consequences doctrine. In our view, the underpinnings and analysis of *Chiu* also bar instruction on first degree murder based on the natural and probable consequences doctrine in the context of a charged conspiracy to commit the target crime, robbery.

However, we further conclude that in this case, the instructional errors are harmless. *Chiu*, where the erroneous aiding and abetting instruction was prejudicial, is factually distinguishable. The record in *Chiu* did not establish beyond a reasonable doubt that the jury based its verdict on the legally valid theory that the defendant directly aided and abetted the premeditated murder, which required that the aider and abettor himself knowingly and intentionally assisted a confederate to kill the victim, rather than on the erroneous theory of indirect aiding and abetting based on the natural and probable consequences doctrine. (*Chiu, supra*, 59 Cal.4th 155, 167.) Here, the record establishes

4

that the jury based the first degree murder convictions of Weisner and Blackshire on a valid felony-murder theory. Unlike the circumstances in *Chiu,* where the record did not reflect the factual predicate for the valid direct aider and abettor theory, in this case the jury's verdict established the elements of felony-murder; i.e., that defendants committed a robbery, and the killing was committed in the commission of a qualifying felony (robbery).

The trial court's denial of the motions for a continuance of the new trial motion and sentencing by Wellington and Blackshire was not an abuse of discretion. Neither had shown good cause for a continuance as to either a new trial motion or sentencing. The sentence of 50 years to life as to Wellington and Blackshire, who were both 17 years old at the time of the crimes, did not violate the Eighth Amendment of the United States Constitution. Even if the sentences of 50 years to life would otherwise be the equivalent of life without possibility of parole, the sentences are not constitutionally infirm because both Wellington and Blackshire are entitled to a parole hearing during the 25th year of incarceration with "a meaningful opportunity to obtain release." (§3051, subds. (b)(3) & (e).)

## I. BACKGROUND

A. *Circumstances of the Robbery and Murder*

In August 2008, the Black P-Stones was a Blood gang with about 835 members. Its rivals were Crips gangs and Hispanic gangs.

The Black P-Stones regularly committed crimes inside and outside its territory Its primary activities included robbery, murder, and other violent crimes. Guns, which were used to commit crimes, were important to the gang, and gang members commonly acquired guns by means of robberies, burglaries, and illegal purchases.

A particular gang's strength is measured by the amount of territory it controls, the number of members it claims, and the degree of violence its members exhibit. A gang member earns respect by "putting in work," i.e., committing crimes or acting for the gang. The most respect comes from committing murder or other violent crimes. A

5

member's commission of murder reflects that the member would do anything for the gang.

In 2008, the Fame Gardens apartment complex was within the territory claimed by the Black P-Stones.

Kolton Walker, who was then a Black P- Stones member known as "K-Bone," and Ella Reed, his girlfriend, testified that on the evening of August 27, 2008, he hung out on a roof at Fame Gardens with various other Black P-Stones members, including appellants and William Dixon, whose moniker was "Ghost." [3]  Blackshire's moniker was "Little Kiwi."  Weisner's moniker was "Big Redrum."  "Redrum" is "murder" spelled backwards.  Wellington's moniker was "Little Redrum," which referred to Big Redrum's "little homeboy, somebody that he took under his confidence, that he allowed to be under his name[.]"  In 2008, Wellington (Little Redrum) was Weisner's "little homie," which was "a special bond or something that they had or something they experienced together which made it all right for Big Redrum to [say] you can be my little homie."  In 2008, of all these gang members, Ghost had the most "clout," or influence.  Ghost was a high ranking member of the Black P-Stones, with shot caller status. [4]

During the August 27 gathering, Ghost stated they did not have enough guns to protect themselves and mentioned there had been a lot of rival gang-related shootings in the area.  After describing how he had robbed security guards to obtain guns in the past, Ghost stated this was the easiest way to get guns without paying.  Appellants, Walker, and the other members present then discussed a plan to rob a security guard.  They did not discuss killing the guard.  Executing the plan would be a means of "putting in work" for the gang.  Ghost suggested the plan be put into action the next day.

Sometime after 6:00 a.m. on August 28, in response to Ghost's call, Walker drove to Fame Gardens.  Ghost, appellants, and several other gang members were already there.  Ghost suggested they canvass the area for security guards with guns.

---

[3] A moniker is a gang nickname.

[4] A shot caller is a gang leader who can give orders to other gang members.

Walker, accompanied by Weisner, drove along Crenshaw until they passed the branch of the Bank of America at 29th Street and Crenshaw, which at this time was on the border of the territory claimed by the Crips. Weisner pointed to a security guard with a weapon standing between the railing and the bank's front door. The guard, Isais Quinones, had a .38 blue steel or chrome revolver with a black handle. Walker and Weisner drove off to inform the others.

They met the other members of the group at an apartment off Adams and 10th Avenue. After they reported their findings, Walker drove Ghost, who wanted to check out the scene himself, back to the bank. Ghost observed the guard, who was talking on his phone and leaning against the railing, and indicated they could "pull it off."

Upon their return, Ghost suggested the easiest way to execute the robbery, which he had done before, would be "to casually or nonchalantly . . . walk by the security guard and try to snatch the gun from him, and then proceed to take his gun and leave[.]" He asked who wanted to join in robbing the guard. Wellington, who wore a gray or black "open hoodie" (a hoodie with a zipper), and Blackshire, who wore a black "full hoodie" with no zipper, volunteered.

Walker then drove Ghost, Wellington, and Blackshire to the bank. Ghost had a black .38 revolver. Walker recalled seeing another all black .38. Upon locating the security guard in the parking lot near the bank's front door, Walker stopped in an alley area. Ghost told Wellington and Blackshire to check their weapons. Each pulled out a black revolver and checked the cylinder for bullets. Walker and Ghost waited in the car. Wellington and Blackshire walked past a Smart & Final parking lot toward the bank. Walker lost sight of them after they turned toward the area where they had spotted Quinones, the guard.

About ten seconds later, Walker heard three gunshots. He saw the guard, Quinones, stumble and fall back and then heard another gunshot. As he heard a fifth shot, he saw Wellington's outstretched arm and saw Quinones fall. He knew it was Wellington's arm, because he remembered "the open hoodie on the person with the outstretched hand." Wellington then ran back toward Walker's car. Blackshire ran to

7

Quinones and reached down to grab something from the body.  He ran back to the car eight to ten seconds behind Wellington.  Inside the car, Ghost asked "you all did that" and Wellington responded, "[W]e did it."  When Wellington and Blackshire left the car to rob the guard, they each had a black .38 gun.  Upon their return, Blackshire pulled out a third gun, a chrome and black .38 revolver.

After Walker drove them back to the apartment, Ghost directed Walker, Wellington, and Blackshire to the kitchen for a talk.  Wellington related that he and Blackshire tried to walk by Walker inconspicuously.  Wellington then tried to snatch Quinones' gun.  Quinones, who was larger, pushed Wellington away and reached for his (Quinones') gun.  Wellington grabbed his own gun and fired first.  Blackshire stated when he realized Quinones was overpowering Wellington, he pulled out his gun and also fired at Quinones.  Walker commented "it wasn't supposed to go like that"; rather, they were supposed to just rob Quinones without shooting him.

Blackshire gave Quinones' gun to Ghost, and Ghost opened the cylinder, which revealed six hollow-point bullets.  Ghost said that if Quinones had shot them, Wellington and Blackshire would have died.

Reed, Walker's girlfriend, testified that when Walker returned home later that morning, she noted his eyes and skin were red and sweaty.  Walker, who was frantic and nervous, explained he "fucked up" and the situation went wrong.  They were looking to get a gun but no one was supposed to get hurt.  He repeatedly said, "I messed up."  He identified his companions as Ghost, Wellington and another male whose name Reed did not recall but believed to be "a youngster like Little Redrum."  Walker related to Reed that during the incident, he and Ghost waited in the car.  Walker said he heard gunshots and then saw the security guard fall.

Shortly after 10:00 a.m. on August 28, Cynthia Collins arrived at the bank and parked her car in the nearby Smart & Final parking lot.  She observed Quinones leaning against a railing toward the bank's main entry.  After turning the corner and walking down the breezeway toward the ATM, she looked briefly at two "very young" African-American males who were about 16 to 18 years old, as they walked by together in her

8

direction. She looked at both faces. Collins, who was five feet, four inches tall, believed one was slightly shorter than she, while the other was her height or slightly taller. She believed both were wearing jeans and hooded sweatshirts with the hoods up. Less than 30 seconds later, while Collins, was using the ATM, someone yelled for her to leave and said, "They're killing someone in the back." Collins identified Wellington from a photographic lineup as "possibly one of the two males [she]saw along with another person the day of the shooting" and stated that he (Wellington) looked most like the person from the day of the crime. In a court hearing in April 2010, Collins identified Wellington, whose photograph she had selected, as resembling the male wearing the gray sweatshirt she saw on the day of the shooting, but she was not sure. The trial court took judicial notice that Wellington was that defendant.

About 10:00 a.m., on August 28, 2008, Michael Kelley was across the street from the bank, and heard one gun-shot followed by three others. After the first shot, he looked in its direction and saw an African-American male with his arm outstretched in a slightly downward angle. The male wore a blue sweatshirt with the hood down. Kelley was 5 feet 6 inches tall. He believed the male appeared to be six feet tall but could not "get a really good estimate of height," because the male's legs were hidden by a cement wall. A few minutes after the last shot, Kelly saw Quinones bleeding on the ground in the same area where that male had been.

Bertie Beasley was talking on her phone in her car, which was parked at the Smart & Final parking lot facing the alley near the bank, when she heard a gunshot and then four more coming from the bank. Someone yelled, "They're killing him, they're killing him and help, help." She then saw two young African-American males running slowly from the bank down the alley. Both held their hands close to their waistlines and appeared to be holding something. They appeared to be about 18 or 19 years old. One wore a gray jogging suit with the hood over his head and was about 5 feet, 2 inches tall. He reminded her of her grandson. The taller male, who wore a dark blue jacket with a hood over his head, appeared to be five feet, four inches tall.

9

During a photographic lineup, Beasley selected photo number 2, which was Wellington's photo, as depicting someone who looked "similar to her grandson." At a court hearing in April 2010, Beasley identified Wellington as having "similar features" to the male she had seen and commented "he looks like my grandson," who was 17 or 18 at the time. At trial, Beasley identified Wellington as the shorter of the two males. She was certain in her identification.

In 2009, Wellington was about five feet, six inches tall and he weighed about 110 pounds. On March 25, 2011, Blackshire was approximately five feet, six inches tall and weighed 150 pounds.

Quinones sustained seven gunshot wounds. The bullet recovered from his right back entered through his back before traveling through his heart and lung. A second bullet entered his chest, went through his right lung, and exited the right side of his chest in a sharp upward direction, consistent with the shooter having pointed the gun at Quinones in a downward angle as Quinones was lying on the ground. A third entered his right side and pierced several organs before resting on the left side of his body. These were the fatal injuries.

The absence of soot or stippling indicated that the bullets were fired at least one and a half to two feet away from Quinones. The same .38 special or .367 magnum revolver fired the bullets or bullet fragments retrieved from Quinones' body and the two bullets recovered from the crime scene. A different gun fired the remaining .38 caliber bullet fragments recovered from around the corner.

B. *Testimony About Events Subsequent to the Robbery and Murder*

About two and a half weeks after the shooting, Weisner, Wellington, Ghost, and Ghost's younger brother went to the home of Walker and Reed and stayed overnight. Ghost asked Walker if he had spoken to anyone about the shooting. Walker said he had not and had not heard anything about it. Wellington had a gun in his waist area that matched the description of Quinones'gun. Walker testified that Wellington later gave him the gun, and Walker put it on a dresser while Wellington slept. When the group left in the morning, Wellington took the gun with him.

A couple of months after the shooting incident, Walker was with Reed when they spotted Wellington. Walker stopped the car and told Wellington not to keep his sweater at his residence because the sweater might have gunpowder on it. Wellington denied having anything at his residence. He added he had sold Quinones' gun to someone who lived close to his sister's house. Walker responded a gun was sometimes "too hot," meaning it had been used in a particular crime.

Walker was arrested in May 2009. When shown a video of his car circling the bank and stopping behind Smart & Final, Walker told police he just gave Ghost and Little Redrum (Wellington) a ride. He knew that Ghost and Wellington already had been arrested. He stated he did not hear any planning or conversation, but admitted hearing some shots. He knew he had "messed up" at that point, because he would be labeled a snitch for having spoken to the police.

The police did not find Quinones' gun, a .38 silver barrel revolver, during the investigation at the scene. They did find a backpack with a watch inside, about 15 feet from Quinones' body. Christopher Cleaver (Christopher)[5] was the major contributor to the partial DNA profile obtained from the watch.

Although he was not a member of the Black P-Stones, Christopher had friends who were members. He "hung out" with them at Fame Gardens, where he lived with his mother and his older brothers James and Derrick. One of these friends was Wellington, who lived in the next building. Wellington told Christopher he was a Black P-Stones member, and that he went by the name Little Redrum. At trial, Christopher also identified Weisner and Blackshire as members of that gang. He knew Weisner as Big Redrum. Both Weisner and Blackshire, who was known as Kiwi, hung out at Fame Gardens in 2008, as did K-Bone (Walker).

In the summer of 2008, Christopher, then 14, saw Wellington with a gun on more than one occasion at Fame Gardens. The gun was not the same on all occasions. Wellington had a couple of revolvers, one black and the other silver.

---

[5] For purposes of clarity we use the first names of the Cleaver brothers.

Christopher kept his backpack in his closet, because he did not ordinarily use it. Around June 2008, he noticed the backpack was missing from his closet. Christopher had lost his watch before he noticed his backpack was missing.

Christopher testified that after Wellington was arrested in 2009, Christopher ran into Weisner at a liquor store and asked what happened to Wellington. Weisner told him that when he was with "his little homie," they went and "hit a lick," or "did a job," meaning "robbed somebody"; the job "just got out of hand; and they "had to do what [they] had to do." Although Weisner did not mention Wellington by name, Christopher knew whom Weisner meant. A "little homie" was "[s]omebody underneath you" or someone "like a little brother figure[.]" He knew Wellington was Weisner's "little homie." He did not know any other "Little Redrums out there[.]"

In January 2011, Christopher was arrested for the murder of Quinones. During a police interview, he was nervous and initially lied. He denied the backpack found at the scene was his and said he didn't know anything about the backpack. At some point, he told police someone, maybe another tenant, took the backpack when Christopher's mom threw it onto the common area patio while cleaning the apartment. He later admitted that the backpack was his when the police told him his DNA was found on the watch inside the backpack.

At trial, Christopher denied knowing about the plan to rob the guard at the bank, denied knowing that any robbery was going to take place, and testified that he did not participate in the murder of the guard.

Christopher's older brother Derrick, who was 16 or 17 years old in 2008 testified that he considered Wellington to be like a brother and he loved him. He knew Weisner as Big Redrum, Wellington as Little Redrum, and Blackshire as Kiwi. He knew all three were Black P-Stones members and hung out together. Ghost, a Black P-Stones member, also hung out with them at that time. Derrick was not a member of the gang.

A couple of weeks before the shooting, Wellington told Derrick on more than one occasion that he needed guns because of "enemies coming through." Weisner and Ghost were present and also said they needed guns.

12

In mid-August 2008, Wellington asked Derrick for a backpack to use, because he planned to stay at his sister's house while his mother was on a trip to Belize. Derrick gave him Christopher's backpack, which he found in a closet.

Derrick learned of Quinones' murder on the news the same day it occurred. At some point after the shooting, while hanging out at Fame Gardens, Derrick overhead Big Redrum (Weisner) tell K-Bone (Walker) that his "little homie," whom Derrick understood was Wellington, had committed the crime with Kiwi (Blackshire). On a subsequent day, when Derrick asked Wellington what Big Redrum was talking about, Wellington responded it was "'either me or him,'" meaning his life or the other's life. He also said Kiwi was with him. Sometime after the shooting, Derrick saw Wellington with a .38 revolver that was silver and black.

Derrick testified he went to the police station after Christopher and the detectives called him. Initially, he lied to police, denying he gave Wellington the backpack or knew anything about the backpack. Derrick was afraid because police told him that others, including Wellington, had implicated him during their jail conversations. Prosecutors called Christopher, Derrick, and his mother to the prosecutor's office to interview them about their proposed testimony before the grand jury. The prosecutors first interviewed Christopher, and then their mother, Cynthia Guy. When Guy came out of the interview room, and before Derrick was called in, she began to cry. Derrick testified that his mother's crying upset him, and he then decided to tell the truth about the backpack, because "I seen my mom's face. I seen her crying. I seen that she was in pain and she was hurt, so I just said, whatever, forget it, and I gave him (Wellington) the backpack."

Detective Laura Evens testified that in March 2011, during the police investigation, she told Blackshire over the phone that she wanted to speak to him about a murder investigation. He asked "'What murder do you want me for?'" Blackshire then agreed to meet her at the station for a discussion but never showed up.

In April 2011, Walker entered into a proffer arrangement whereby he agreed to tell the truth without any promise of leniency. After viewing still photographs from the

13

bank's security videos, he selected two photographs as depicting Wellington, who was wearing a hat, as the person in front and Blackshire as the person behind him.

On May 13, 2011, following his arrest, Weisner told Detective Evens he did not know anything about the security guard killed at the bank. When she told him the guard was on his last day of work and had a wife and three small children, Weisner smiled, folded his arms, and snickered.

C. *Other Relevant Trial Proceedings and Defense*

On May 17, 2011, a bailiff at the arraignment court saw Wellington remove a note from his pocket and place it on the counter with his hand covering it. The bailiff confiscated it. The note stated: "Mom, I need you to write to Corey and tell him to ask Ghost (one eye) if he don't mind could he take the rap for the case like he said he would do. Tell him I'll appreciate it. I think K-Bone took a deal to testify against me. If he take it, tell him I'm going to look out for him. Also I need you to have Chinique do that before Friday. Please and thanks. And I need you to look into Aladdin Bail Bonds too and talk to Javier."

On the same date, Wellington called his parents from jail. During the call, he discussed the intercepted note with his mother. After she told him the note was given to the detectives, Wellington said, "I give up[.]" When his father asked what was in the note, Wellington said he wanted his father to "tell mama to write Corey and tell her to talk to (unintelligible) and One Eye and just make him take the whole thing." His father responded by asking, "Why would you do that?" and saying, "You are the one that screw your own dreams. Bye . . . . You're the one that screw your own dreams. Think you're so smart." Wellington again asked him to tell his mother to write Corey and tell her . . . [to] talk to One Eye and . . . tell him just take – if he can't get it, tell everybody (unintelligible) the thing (unintelligible) only if he say I take it, make contact, you know."

Blackshire relied on an alibi defense at trial. Keadra Welch testified that on August 28, 2008, from about 10:00 or 11:00 a.m. until 5:30 or 6:00 p.m., Blackshire was with her at his residence. Sundie Blackshire, his sister, testified they lived with their parents and from 6:35 p.m. on August 27, 2008, Blackshire did not leave the residence

14

that night.  On August 28, 2008, when she left at 7:45 a.m. to go to work, Blackshire was still at home.  She called their home phone and spoke with Blackshire at about 9:30 a.m.

Blackshire also presented testimony from Alonzo Williams, Walker's cellmate in 2010.  Williams testified that Walker said that he would do anything to get back to his family, including "making something up[.]"  Williams testified that Walker told him that Ghost and Weisner had tormented him as a child for being a victim of molestation and for his facial features.  Walker also told Williams that Weisner had sex with Walker's girlfriend, and Walker hated Weisner.  He was going to get Weisner and "pay him back[.]"  Williams also testified that Walker had mental issues, would talk to himself at night, had bad dreams, and said, "Cleaver, Cleaver, Cleaver."  Williams characterized Walker as a "snitch."  He testified that he and Walker had a physical fight after Williams thought Walker looked through Williams' paperwork to "get a better deal."

Wellington testified on his own behalf.  He admitted that in 2008 he was associated with the Black P-Stones gang, but denied he was a member.  He admitted he went by "Little Redrum," and that he knew Weisner was "Big Redrum" and a member of the Black P-Stones.  He denied knowing "redrum" was "murder" spelled backwards until he heard this at trial.  He denied ever attending any Black P-Stones meetings and denied that he was ever asked to commit crimes or carry a weapon.  He denied asking Derrick to loan him a backpack.  He denied being at the bank on August 28, 2008, or knowing Ghost, Walker, or Reed during the relevant time.  He denied ever spending the night at Reed's home.

Wellington denied ever speaking to Ghost, although in his note he wrote he wanted Corey to ask Ghost to take "the rap" for him.  He explained that while in jail custody his first year, "word" had gotten back to him that Ghost was telling others that Wellington had not committed the crime.  He denied ever asking Ghost to take the rap for him.

Wellington also relied on an alibi defense.  He testified he was at the home of Chinique Gray, his sister, on August 27 and 28, 2008, watching her children while she was away.  Dawnya Darling testified that she and Wellington had been romantically

15

involved and she was certain he was with her around August 26 through 29, 2008, because these dates represent three family birthdays. Gray testified Wellington stayed at her apartment from July 15, 2008 "for over a month." She recalled Wellington was there with Darling on the night of August 26, 2008, Gray's birthday, watching her three children while she was at a casino; he was still there upon her return the next morning; and he was still there on the morning of August 29. Davion Latham, Gray's boyfriend, testified Wellington was present and attended family birthdays from August 27 through August 29, 2008.

In addition, Wellington relied on character evidence He also called a defense gang expert witness.

Weisner did not present an affirmative defense.

## II. DISCUSSION

A. *Conviction Issues*

1. *Motions for Acquittal Properly Denied*

Weisner and Blackshire contend the trial court erred in denying their motions for acquittal, because the evidence was insufficient to corroborate the testimony of Walker, an accomplice. We disagree.

a. *Standard of Review*

"[O]n motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, [the trial court] shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal." (§1118.1)

"In determining whether the evidence was sufficient either to sustain a conviction or to support the denial of a section 1118.1 motion, the standard of review is essentially the same. [Citation.] "'"[W]e do not determine the facts ourselves. Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable

16

doubt.' [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.] We do not reweigh evidence or reevaluate a witness's credibility.'" [Citations.] Notably, however, '[r]eview of the denial of a section 1118.1 motion made at the close of a prosecutor's case-in-chief focuses on the state of the evidence as it stood at that point.' [Citation.]" (*People v. Hajek* (2014) 58 Cal.4th 1144, 1182-1183, quotation marks original.)

    b. *Section 1118.1 Motions for Acquittal*

    Following closure of the prosecution's case, Weisner and Blackshire moved for acquittal under section 1118.1. Blackshire argued Walker's testimony provided the only evidence of his identity as a perpetrator and there was insufficient evidence to corroborate such identification. Weisner also argued the evidence was insufficient to corroborate Walker's testimony and that Reed's testimony was not credible in light of her admission she consumed drugs and alcohol.

    With the preface that the evidence was to be viewed in the light most favorable to the People, the trial court stated it had "little trouble, frankly, denying the motions for judgment of acquittal for each of these defendants." The court found Walker to be an "impressive and articulate witness" and Reed to be "equally impressive." After finding the evidence was "very strong," the court denied the motions.

    c. *Denial of Motions Not Error*

    It is undisputed that Walker, who was subject to prosecution for the identical offenses charged against Blackshire and Weisner, was an accomplice. (§1111.) "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense[.]" (*Ibid*.) The accomplice's testimony or that of another accomplice cannot

17

supply the requisite corroboration.  (*People v. Whalen* (2013) 56 Cal.4th 1, 55 (*Whalen*). "Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone.  [Citations.]"  (*People v. Manibusan* (2013) 58 Cal.4th 40, 95, internal quotation marks omitted (*Manibusan*).)  The corroborating evidence need not establish every element of the offense nor corroborate the exact facts or "every fact to which the accomplice testifies."  (*Whalen, supra*, at p. 55.  "It is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.  [Citation.]"  (*Manibusan, supra,* at p. 95.) In contrast, "[i]ndependent evidence that corroborates portions of the accomplice's testimony, but which does not tend to connect the defendant to the crime, is not enough by itself to constitute sufficient corroboration[.]"  (*People v. Pedroza* (2014) 231 Cal.App.4th 635, 656.)  Nonetheless, evidence corroborating details of the crime "may form part of a picture [from which] the jury may be satisfied that the accomplice is telling the truth" when viewed "*in addition* to other evidence tending to connect the defendant with the crime."  (*Id*. at pp. 656, 657, citations omitted, emphasis in original.)

Through Walker's testimony, the jury learned that the night before the murder and robbery, members of the Black P-Stones, including Walker, Ghost, Wellington, Weisner, and Blackshire, gathered to formulate a plan to steal a gun from a security guard for the gang's benefit.  On the morning of the crimes, Walker and Weisner scouted for potential victims; Weisner selected Quinones; and the two reported their findings to the others. Walker then drove himself, Ghost, Wellington and Blackshire to the bank.  Both Wellington and Blackshire were armed with handguns.  Although Walker lost sight of Wellington and Blackshire briefly, he observed Wellington's outstretched arm as he heard shots and then saw Quinones fall.  Blackshire retrieved an object from Quinones' body.  Blackshire gave Quinones' gun, a silver .38 caliber revolver with a black handle, to Ghost upon their return to the car.  Both Wellington and Blackshire admitted firing at Quinones.

Reed's testimony served to corroborate Walker's.  Reed was on the Fame Gardens' roof with Walker, Ghost, Wellington, Weisner, and "a few more young ones"

during the group's discussion of robbing a security guard. She also testified regarding the circumstances leading up to and the commission of the crimes. Early the next morning, after he received a call from Ghost, Walker left her residence. Upon his return, Walker's skin was red and sweaty, and he appeared frantic or nervous. After telling Reed they had gone looking to get a gun and no one was supposed to get hurt, Walker said "I fucked up" and repeatedly stated "I messed up." He told her Ghost, Wellington and another whom Reed believed was "a youngster like Little Redrum," although she did not recall the name, were with him. During the crimes, he and Ghost waited in the car. He heard gunshots and saw the security guard fall.

Reed's testimony regarding what happened after the murder also corroborated Walker's testimony. At some point afterward, Weisner, Wellington, and Ghost stayed overnight at the residence she shared with Walker. Wellington kept falling asleep and at some point Wellington or someone else placed a gun, "like an old gun with a big old barrel" on a shelf in her living room. A few months after the crimes, Walker told Wellington not to store his sweater at his mother's house and to get rid of it because of possible gunpowder on the sweater. Wellington responded he had nothing there.

Walker's testimony also was corroborated by other evidence. As to Weisner and Wellington, their own self-incriminating statements to others are sufficient corroboration of Walker's testimony. (*People v. Gurule* (2002) 28 Cal.4th 557, 628 [defendant's extrajudicial statements corroboration for accomplice's testimony] *People v. Ray* (1962) 210 Cal.App.2d 697, 703 ["each defendant's own admissions . . . sufficient corroboration so far as he or she is concerned"].) A few weeks prior to the crimes, Derrick heard Weisner and Wellington say they needed guns. Wellington also said guns were necessary because "'enemies [have] been coming through.'" After Wellington's arrest, Christopher saw Weisner at a store and asked what happened to Wellington. Weisner responded, "'[W]e hit a lick,'" meaning he and Wellington together committed a robbery; the robbery " 'got out of hand'"; and "we had to do what we had to do.'"

The out-of-court statements of Weisner and Wellington also constitute corroboration of Walker's testimony as to Blackshire's involvement in the crimes,

because the statements of these accomplices were not testimonial within the meaning of section 1111, and thus, did not themselves require corroboration. The "testimony" disqualified as corroboration under that section "'includes all oral statements made by an accomplice or coconspirator under oath in a court proceeding *and* all out-of-court statements of accomplices and coconspirators used as substantive evidence of guilt which are made under suspect circumstances. The most obvious suspect circumstances occur when the accomplice has been arrested or is questioned by police.' [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 153, 245 (*Williams*).) "'On the other hand, when the out-of-court statements are not given under suspect circumstances, those statements do not qualify as 'testimony' and hence need not be corroborated under . . . section 1111.' [Citations.]" (*Ibid.*) That is the situation here.[6]

At some point after the crimes, Derrick heard Weisner tell Walker that Blackshire committed the shooting with "his [Weisner's] little homie," meaning Wellington, who

---

[6] At trial, the court reminded counsel all parties had stipulated and agreed to stand by the pre-trial ruling of Judge Ito that statements being admitted as to all defendants . . . are admitted under *Crawford* [*v. Washington* (2004) 541 U.S. 36] and its progeny"; "[t]he only statements that are restricted are Wellington's . . . to his mother [in the note]" and those are "admissible only against [him]"; "Blackshire's statement to his sister will be admissible only against Blackshire"; and "[t]he other conversations are admissible as to all defendants."

During Blackshire's closing argument, his counsel referred to certain statements as being made by accomplices and to a jury instruction barring corroboration of the testimony of an accomplice by that of another accomplice. At side bar, the court stated he was misconstruing the law, because the only accomplice here was the car's driver, i.e., Walker, and these statements were those of co-conspirators. The court instructed the jury that "a statement of a co-conspirator may be considered if it's made in furtherance of the conspiracy against all other co-conspirators" and "there is a special legal definition of what constitutes an accomplice. An accomplice is a person who is subject to prosecution for the identical crimes charged against the defendants on trial. The defendants on trial are not accomplices. The instruction here focuses on persons who come into court and say, I did the crime with the man on trial, and that person is someone who is subject to the same crime or charge that the person who is on trial is subject to." The court added "you've been instructed in 335 as to how to handle the testimony of . . . . Walker who was an accomplice witness in this case. But a defendant who is on trial is not, quote, an accomplice witness as the law applies to . . . Walker."

20

also was known as Little Redrum. Later, when Derrick asked Wellington what Weisner was talking about, Wellington responded it was "'either me or him[, meaning the victim].'" He also related Blackshire was with him. These out-of-court statements of Weisner and Wellington implicating Blackshire did not amount to barred accomplice testimony under section 1111, because they were uttered in a non-custodial, non-coercive setting among friends. (*Williams, supra*, 16 Cal.4th 153, at p. 246 [accomplice's out-of-court statements not given under suspect circumstances because uttered to fellow drug user while ingesting drugs together, not during detention or incarceration].)

Further, evidence of eyewitnesses also corroborated Walker's testimony as to Blackshire's involvement in the crimes. Walker believed that during the crimes, Wellington wore a gray or black hooded sweatshirt while Blackshire wore a black hooded sweatshirt. Both Wellington and Blackshire were 17 years old at the time of the crimes. Both Wellington and Blackshire were five feet, six inches tall. Collins described the two males she saw as "young," "16, 17, 18" years old; wearing hooded sweatshirts that were probably gray; and about her height, which was five feet, four inches tall, although one was slightly shorter. Beasley believed them to be about 18 to 19 years old and also described them as wearing hooded sweatshirts. In court, she identified Wellington as the shorter of the two and believed he stood about five feet, two inches. He was wearing a gray hooded sweatshirt. She believed the other male stood about five feet, four inches tall and wore a dark blue hooded sweatshirt.

2. *The Quashing of the Defense Witness Subpoena Was Not a Deprivation of the Right to Present a Defense*

Appellants contend the trial court violated their respective rights to present a defense when the court quashed a defense subpoena served on William Dixon (Ghost), because the court should have required Ghost to invoke his privilege against self-incrimination (U.S. Const., 5th Amend.) under oath rather than accepting his counsel's representation that Ghost would make such invocation. They have failed to demonstrate any abuse or constitutional infirmity in the trial court's order.

21

Counsel for Blackshire served a subpoena on Ghost.  On July 16, 2013, at an ex parte hearing during the prosecution's case-in-chief, Blackshire's counsel sought to have an investigator interview Ghost regarding a note Ghost allegedly wrote to Wellington's mother, in which he accepted responsibility for the murder. [7]

Counsel indicated Ghost had just been arraigned in a separate case and was in county jail.  The trial court directed counsel to contact the county bar panel to confirm Ghost was represented and admonished him not to speak to Ghost without his counsel present.  Blackshire's counsel responded he intended to speak to Ghost "extensively [on] issues involving this case" and he agreed that "depending on what the new charge is, [Ghost] probably [will have to have] the permission of his attorney."

At a subsequent ex parte hearing the same day with counsel for each of appellants present, the trial court related what Ghost's counsel had told to the court clerk:  Ghost faced the death penalty as a defendant in a four-victim murder case.  His attorney was concerned Ghost would be a suspect in the instant case.  After stating she (the attorney) was presently on vacation, the attorney stated "in very explicit terms no one has her permission to talk to [Ghost]," although she made her phone number available to all three defense counsel.  The trial court stated it would "cancel" Ghost's appearance for the following day in court, because his counsel was "adamant" Ghost would not be called as a witness.

Counsel for Wellington argued Ghost's testimony was relevant to Wellington's claim that the reference in his intercepted note to his mother, in which he sought to ask Ghost to "take the rap" in this case, was based on Wellington's understanding that Ghost would exonerate him.  Counsel added Ghost's testimony also was relevant to explore

---

[7] The record is muddled as to this alleged note.  During a hearing on the appellants' motion for a new trial, Wellington's counsel stated to the court that "we tried to get him (Ghost) called here as a witness because my client (Wellington) explained that Ghost had sent him a note after the first trial, saying, I know you had nothing to do with it. I can-well, you may not choose to believe it, but doesn't my client get a chance to have the jury consider that without--"  Counsels' confused and inconsistent arguments simply reinforce the speculative nature of the request to subpoena Ghost.

why the prosecution had not charged Ghost in this case. After noting the prosecution may have exercised its discretion not to charge Ghost in this case because of unrelated murder charges pending against him, the court found the prosecution's reason for not charging Ghost was irrelevant. The court stated it would not allow Ghost to testify, because this would allow the jury to speculate as to why he was not charged. The court further stated it would not allow Blackshire's counsel to call Ghost simply to "have him take the Fifth [Amendment] to put on a show for the jury. That's improper. You know that." Weisner's counsel acknowledged "[t]hat would be improper" but argued although Ghost's attorney did not want him to testify, the right not to do so belonged to Ghost and "we don'[t know whether or not he would want to testify over the advice of his counsel."

Counsel for Weisner and Blackshire requested that the trial court order Ghost's personal appearance to enable them to determine if Ghost would testify over his counsel's objection. Mojan Aghai, Wellington's cocounsel, suggested Ghost might testify in this case, because she heard he already confessed to the murders charged in his pending case. The trial court denied the request to order Ghost's appearance without his counsel and canceled the subpoena for the following day.

We conclude the trial court did not abuse its discretion in quashing the subpoena for Ghost's appearance the next day in court. (*People v. Campo* (1987) 193 Cal.App.3d 1423, 1428 [abuse of discretion review standard].) Initially, appellants misapprehend the nature and effect of the trial court's July 16, 2013 order quashing the subpoena. The court merely quashed the subpoena for Ghost's appearance on the following court day, not with prejudice to any future attempts to subpoena him. The record does not reflect the court found that counsel for the witness was exercising the witness' Fifth Amendment privilege against self-incrimination. Rather, the court recognized Ghost's constitutional right to counsel. Although Ghost was not then charged as a defendant in the instant case, questioning might have elicited incriminating testimony subjecting him to such prosecution. Ghost therefore was entitled to the presence of counsel at the time he or she was called as a witness. Additionally, the jury did not return its verdicts until July 30, 2013. The record does not reflect Ghost's counsel was unavailable until that date or that

23

any of appellants' counsel had served or attempted to serve a later witness subpoena to allow the court more time to consider the issues, locate counsel or appoint counsel for a limited purpose.

Furthermore, a trial court may properly quash a subpoena where a witness cannot offer testimony that is relevant. (*In re Finn* (1960) 54 Cal.2d 807, 813; *People v. Fabricant* (1980) 104 Cal.App.3d 905, 915.) [8] The trial court correctly found the prosecution's reason for not yet charging Ghost in this case was irrelevant. Further, Wellington did not offer any evidence from which the trial court could find that Ghost might have relevant testimony. Wellington in fact admitted he had never spoken to the witness about this issue. Wellington merely testified that "word" had gotten back to him while he was in custody that Ghost was telling people Wellington had not committed the crime. This self-serving testimony amounts to no more than rumor and speculation . Speculation is not evidence, nor are speculative inferences. (*People v. Mendoza* (2000) 24 Cal.4th 130, 174; *People v. Kraft* (2000) 23 Cal.4th 978, 1035.)

In conclusion, the trial court did not violate the appellants' respective rights to present a defense by quashing the subpoena for the witness's appearance the following court day. Although a defendant has a due process right to compel the presence of witnesses on his or her behalf (*Washington v. Texas* (1967) 388 U.S. 14, 18-19), this right applies only to witnesses "whose testimony would be relevant and material to the defense." (*Id*. at p. 23.) Appellants failed to carry their burden to demonstrate the relevance of Ghost's anticipated testimony to a material issue in this case.

3. *The Denial of Defense Eyewitness Expert Testimony Was Harmless*

Wellington contends the trial court violated his rights to due process, to a fair trial, to present a defense, and to effective assistance of counsel both by failing to fund a defense eyewitness expert and by refusing to allow the retained expert to testify. We find

---

[8] Only relevant evidence is admissible (Evid. Code, § 350.) Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "The trial court has broad discretion in determining the relevance of evidence [Citations] [.]" (*People v. Scheid* (1997) 16 Cal.4th 1, 14.)

any error to be harmless.

a. *Proceedings Pertaining to Defense Eyewitness Expert*

Prior to trial, Beasley, who was parked at the Smart & Final lot and heard gunshots from the bank, was unable to identify anyone from a photographic lineup which included Wellington's photograph. She did tell the police the individual in photograph number 2, (of Wellington), looked similar to her grandson. At the preliminary hearing, Beasley identified Wellington as resembling both the person she saw on the day of the shooting and her grandson. At trial, she identified Wellington as the shorter of the two males she saw running from the bank after she heard gunshots, and she was "sure" of her identification. She remembered him "very specifically," because he looked similar to her grandson. She was unable to identify the other male. She explained that male was not as close to her and she had gotten a better look at Wellington.

On cross-examination at trial, Wellington's counsel repeatedly asked Beasley whether she identified Wellington only because his features were similar to the perpetrator or if she was unsure of her identification. In confirming the certainty of her identification Beasley explained she was able to identify Wellington because he "looked like" and reminded her of her grandson.

On July 16, 2013, at an ex parte hearing, Wellington's counsel asked the trial court to order funding to obtain a court-appointed eyewitness identification expert. The court expressed its view that the case would not turn on eyewitness identification; rather, the critical evidence would be the accomplice testimony. The court found Beasley's identification did not seem "all that meaningful," because she did not identify Wellington initially.

Ms. Aghai, Wellington's cocounsel, argued expert testimony was necessary to explain why Beasley's identification, which had become more certain, was erroneous. Citing to *People v. McDonald* (1984) 37 Cal.3d 352, overruled in *People v. Mendoza* (2000) 23 Cal.4th 896, 914, on another point, she argued an eyewitness expert was appropriate in this case because of the minimal physical evidence and an identification that did not "make sense" and also would serve to explain Collins' identification. She

25

advised the court that Wellington's family did not have funds to pay for the expert, Dr. Eisen, whose name was on the witness list. The court indicated it was not inclined to grant the request but would give the matter further consideration after hearing the accomplice testimony.

On July 18, 2013, after Walker testified, the court denied the request for public funds. The court explained an eyewitness identification expert was not warranted, because Beasley's testimony was not critical in view of "other evidence in the case."

On July 23, 2013, during the defense case, Wellington sought to present the eyewitness expert testimony of Dr. Eisen, whom the defense itself apparently retained. The court found this was not an appropriate case for such an expert in view of the testimony of the accomplice and the accomplice's girlfriend. The court expressed its view that Wellington's counsel had many points on which to impeach Beasley's identification, which the court found was not "particularly compelling." The prosecutor requested time to conduct discovery and determine if additional witnesses were necessary if the court permitted Dr. Eisen to testify. On its own motion, the court excluded Dr. Eisen's testimony under Evidence Code section 352 as "likely to confuse" the jury.

b. *Any Error Regarding the Eyewitness Identification Expert Was Harmless and Non-Prejudicial*

Initially, we conclude any error in the trial court's denial of funding for the appointment of Dr. Eisen as a defense eyewitness identification expert did not prejudice Wellington, because such lack of funding did not prevent Wellington from obtaining the services of Dr. Eisen for the purposes of presenting a defense at trial.

We further conclude that any error in excluding Dr. Eisen's testimony at trial was harmless and non-prejudicial. A result more favorable to Wellington was not reasonably probable if the testimony had been admitted. (*People v. Sanders* (1995) 11 Cal.4th 475, 510 (*Sanders*).) The defense did not present an offer of proof as to Dr. Eisen's testimony. In addition, the proposed testimony did not have a particularly high probative value, because Beasley's identification of Wellington as a perpetrator was not a "key element" of the prosecutor's case (*McDonald, supra*, 37 Cal.3d at p. 377) and the evidence

26

establishing Wellington as the actual shooter was very strong. Additionally, the court instructed the jury adequately on how to view eyewitness identification evidence by giving CALCRIM No. 315, which set out the factors the jury was to consider in assessing the accuracy and reliability of such evidence. (*Sanders, supra*, at p. 510; *People v. Plasencia* (1985) 168 Cal.App.3d 546, 556.)

c. *No Denial of Right to Effective Assistance of Counsel Shown*

Contrary to Wellington's claim, the exclusion of this testimony did not deprive him of his constitutional right to effective assistance of counsel (U.S. Const., 6th Amend.). To establish such deprivation, Wellington has to demonstrate both that counsel's performance was deficient and also that it prejudiced him, i.e., it is reasonably probable a result more favorable would have ensued absent counsel's deficiency. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) Our conclusion that he has failed to establish prejudicial error, as described above, obviates the need to address whether his counsel's performance was deficient. (*People v. Holt* (1997) 15 Cal.4th 619, 703.)

4. *Admission of Credibility Witness Not Abuse*

Blackshire contends the trial court abused its discretion in admitting the testimony of Cynthia Guy, the mother of Derrick and Christopher. We disagree.

At trial, Christopher testified he did not participate in any crimes or plan to commit crimes regarding the murder of Quinones. Derrick admitted at trial that he initially lied to police about the backpack because he did not want anything to do with the matter and thought he might go to jail even though he did not commit the crimes. He explained that during interviews with the prosecution a few days before the grand jury hearing, he saw his mother crying, which affected him. He then told the truth at the grand jury hearing, i.e., that he gave the backpack to Wellington. He admitted having suffered a felony drug conviction.

When the prosecutor called Guy as a witness, Wellington's counsel asked for an offer of proof. The prosecutor explained he was certain that at Wellington's first trial, Guy testified she saw the backpack being given to someone, that she started crying before the grand jury, and she then told Derrick to tell the truth. Weisner's counsel objected,

"352." The court responded it would allow "limited inquiry" because Guy's testimony "helps corroborate the witnesses." Blackshire did not join in Weisner's objection. No further argument was made by defense counsel.

Guy testified at trial that prior to August 2008, she saw Derrick hand a backpack to someone outside their patio door. The bank incident occurred after this happened. When she came to the grand jury proceedings, she was very upset, cried, and told Derrick and Christopher to tell the truth.

Under Evidence Code section 352, "the trial court is vested with wide discretion in determining relevance and in weighing the prejudicial effect of proffered evidence against its probative value. Its rulings will not be overturned on appeal absent an abuse of that discretion. [Citations.]" (*People v. Edwards* (1991) 54 Cal.3d 787, 817.) Moreover, no "particular formula" is required of the trial court "for engaging in the weighing process" of the probative value against any prejudicial effect regarding the admission of evidence "so long as the record reflects in some fashion that the court has done so. [Citation.]" (*Ibid*.)

The burden is on the objecting party to show the trial court abused its discretion in admitting the assigned evidence. (*People v. Lewis* (2009) 46 Cal.4th 1255, 1288.) "Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

Initially, we conclude Blackshire forfeited his claim of error regarding the admission of Guy's testimony by failing to object himself or join in Weisner's objection. (*People v. Wilson* (2008) 44 Cal.4th 758, 792.) Further, he has failed to carry his burden to show the trial court abused its discretion. The prosecution theory was that because Wellington borrowed the backpack and then left it at the crime scene, its presence did not indicate that Christopher was one of the two perpetrators. Guy's testimony was probative as to why Christopher's backpack was found at the scene. It served to corroborate

Derrick's testimony that he gave Wellington the backpack.

Blackshire points out the trial court did not explicitly weigh the probative value of Guy's testimony against the prejudice flowing from its admission. Nonetheless, "the necessary showing may be inferred from the record." (*People v. Prince* (2007) 40 Cal.4th 1179, 1237.) After the prosecutor spoke to the probative value of Guy's testimony, the court announced it would allow "limited inquiry" in view of the corroborative purpose of such testimony. In the face of the "352" objection by Weisner's counsel, a reasonable inference is that the court weighed the potential prejudicial impact of the testimony against its probative value before ruling that Guy's testimony was admissible.

Additionally, admission of Guy's testimony did not prejudice Blackshire or the other appellants. ""Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption '"substantially outweigh"' the probative value of relevant evidence, a section 352 objection should fail. [Citation.] '"The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."'" [Citation.]" [Citation.] [¶] [Citation.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 438-439.) There was no error in the trial court's admission of the testimony under this standard.

5. *Prejudicial Prosecutorial Misconduct Not Shown*

Blackshire contends the prosecutor committed prejudicial misconduct by first eliciting Detective Evens' testimony that Blackshire did not go to the police station and talk with her as he had agreed to do and, second, by later arguing to the jury that Blackshire's failure to do so demonstrated his consciousness of guilt. No prejudicial misconduct transpired.

29

At trial, Detective Evens testified Blackshire called her after she had made several attempts to locate him and tried to get his mother to have Blackshire turn himself in. Evens told Blackshire she wanted to speak to him about a shooting and murder investigation. He asked: "What murder do you want me for?" She asked him to meet her at the police station as soon as possible so he could tell her his side of the story. She gave him the address of the station. Blackshire responded he would come as soon as he could. Blackshire however, "did not show up." Blackshire's counsel objected to this testimony.

At sidebar, counsel argued Blackshire was entitled not to make any statement to the police; he was under no obligation to go to the police station; and he had a privilege against self-incrimination. The trial court offered to instruct "the jury that there's no obligation to talk to the police and there's no obligation to come to the police station because the police have invited you to[,] if that's what [counsel] want me to say." Counsel replied, "I appreciate that."

The court then instructed the jury that "no one is obligated to talk to the police or to come to a station to talk to the police. There's no legal requirement." The prosecutor then elicited Evens' testimony that Blackshire agreed to meet her at the station, he never showed up, and she eventually arrested him. During closing argument, the prosecutor argued, without objection: "And we also heard [Blackshire]. The whole[sic], which murder do you want me for? All right. All right. I'm going to meet you. I'll meet you there. All right. He never shows up. And does he have a legal obligation to? No. But does this person, who is not involved with anything, agree to meet the police, to come down there, and then not show up. The police then search two places, track him down, and find him somewhere else."

"The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such '"unfairness as to make the resulting conviction a denial of due process."' [Citations.] Under state law, a prosecutor who uses such methods commits misconduct

30

even when those actions do not result in a fundamentally unfair trial.' [Citation.] 'In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.' [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, '"the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."' [Citation.]" (*People v. Friend* (2009) 47 Cal.4th 1, 29.) Prejudice does not exist where ""'it is not reasonably probable that the prosecutor's occasional intemperate behavior affected the jury's evaluation of the evidence or the rendering of its verdict."' [Citation.]" (*People v. Friend*, *supra*, 47 Cal.4th at p. 31.)

We first conclude Blackshire forfeited his claims of error. As to the first claim that the prosecutor improperly elicited Evens' testimony, he did not object specifically on the ground of prosecutorial misconduct. As to the second claim, regarding closing argument, he did not object at all. (*People v. Thomas* (2012) 54 Cal.4th 908, 937-938 [forfeiture where objection below not on specific ground of prosecutorial misconduct raised on appeal].)

Further, even if the prosecutor's actions amounted to misconduct, Blackshire was not prejudiced. Immediately after Even's testimony to the effect that Blackshire agreed to meet with Evens at the police station but failed to appear, the court expressly admonished the jury that no one was obligated to talk with the police or to go to a police station to talk with the police. This curative instruction was given with the approval of Blackshire's counsel. "It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions. [Citation.]" (*People v. Gonzales* (2011) 51 Cal.4th 894, 940 (*Gonzales*).) As in *Gonzales*, "[t]he record [here] reflects no confusion on the part of the jury, or requests for further guidance on these points." (*Ibid*.) We therefore presume the jury understood and adhered to these instructions by assigning no significance whatsoever to the testimony. (*People v. Holt, supra*, 15 Cal.4th at p. 662.)

Blackshire's second allegation of error is that the prosecutor argued in closing that Blackshire's failure to meet with police demonstrated consciousness of guilt. This argument is without foundation; the prosecutor did not argue Blackshire's failure to talk to police demonstrated consciousness of guilt. Nor did the court instruct the jury on consciousness of guilt. Blackshire's arguments as to prosecutorial misconduct therefore fail.

6. *People v. Chiu Instructional Error Was Harmless*

Weisner and Blackshire challenge their respective first degree murder convictions on the ground the trial court committed reversible error in instructing the jury on the legally invalid theory that first degree murder was the natural and probable consequence of aiding and abetting the commission of robbery, the target offense. Respondent concedes error in view of *People v. Chiu, supra*, 59 Cal.4th 155, but argues the error does not require reversal. We find the error harmless.

a. *Relevant Instructions Given*

The trial court instructed that defendants were prosecuted on "two theories: (1) the murder was willful, deliberate, and premeditated [premeditated first degree murder], and (2) felony murder" and "[e]ach theory of murder has different requirements[.]" Instruction on premeditated first degree murder was based on direct liability and derivative liability theories. In order to find a defendant guilty of first degree murder as a direct perpetrator, the jury had to find that "he acted willfully, deliberately, and with premeditation." As for derivative liability, the jury was instructed a defendant was guilty of first degree murder under the natural and probable consequences doctrine if the prosecution proved he was an aider and abettor in the robbery or a coconspirator in the commission of the robbery.

In pertinent part, the jury was instructed on felony murder as follows:

"A defendant is guilty of first degree murder if the People have proved he committed felony murder[.]"

"A defendant may be guilty of first degree murder, under a theory of felony murder, if he did an act that resulted in the death or if another person [whom the court

32

referred to as the perpetrator] did an act that resulted in the death [of a person].

"To prove that a defendant is guilty of first degree murder under this theory, the People must prove that: 1. The defendant committed, or aided and abetted, or was a member of a conspiracy to commit robbery; 2. The defendant intended to commit, or intended to aid and abet the perpetrator in committing, or intended that one or more of the members of the conspiracy commit robbery; 3. If the defendant personally committed robbery, or a perpetrator, whom the defendant was aiding and abetting or with whom the defendant conspired, personally committed the robbery; 4. While committing robbery, the defendant or the perpetrator caused the death of another person; AND 5. There was a logical connection between the cause of death and the robbery. The connection between the cause of death and the robbery must involve more than just their occurrence in the same time and place.

"A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent . . . . It is not required that the defendant be present when the death occurs."                                    . . .

"In order for the People to prove that the defendant is guilty of murder under a theory of felony murder, the People must prove that the robbery and the act causing the death were part of one continuous transaction."

The jury also was instructed that, depending on its findings about the facts of this case, certain instructions may not apply and the jury was to follow the instructions that applied to the facts as it found them.

The evidence established Wellington was the direct perpetrator who shot and killed Quinones, and the jury therefore necessarily so found. Accordingly, the jury also necessarily found Weisner and Blackshire guilty of first degree murder under either the felony murder theory or on a derivative liability theory of aiding and abetting robbery or conspiracy to commit robbery under the natural and probable consequences doctrine.

b. *Validity of First Degree Murder Instructions as to Weisner and Blackshire*

As the parties acknowledge, in *Chiu*, the court held that a first degree murder conviction based on premeditation cannot be based on an indirect aider and abettor theory

33

of liability grounded in the natural and probable consequences doctrine. (*Chiu, supra*, at pp. 158-159.) The convictions of Weisner and Blackshire for first degree murder therefore cannot stand based on this theory of liability.

Whether first degree murder convictions could be upheld on the theory that first degree murder was the natural and probable consequence of a conspiracy to commit robbery was not before the court in *Chiu*. In *Rivera* (2015) 234 Cal.App.4th 1350, the court held instruction on an uncharged conspiracy theory of first degree murder was error. It allowed the jury to find defendant guilty of first degree murder if it found the target of the uncharged conspiracy was discharging a firearm at an occupied vehicle and that first degree murder was a natural and probable consequence of that crime. The difference between applying the natural and probable consequences doctrine to an aider and abettor and a coconspirator was inconsequential. "The difference in the two theories of liability is that 'the conspirator need only intend to agree or conspire and to commit the offense which is the object of the conspiracy [citation], while the aider and abettor must intend to commit the offense or to encourage or facilitate its commission.' [Citations.]" (*Id.* at p. 1356, fn 5.) Finding the analysis in *Rivera* persuasive, we conclude the trial court erred in instructing the jury on first degree murder under the natural and probable consequences doctrine in the context of conspiracy to commit robbery. In *Rivera*, the court also found the instructional error prejudicial. During deliberations, the jury asked whether the defendant, as "an aider/abettor and/or co-conspirator," would be "guilty of the same level of murder ([first] degree, [second] degree) as the[ perpetrator.]" The court referred the jury to the erroneous instructions previously given. (*Rivera, supra*, at p. 1358.)

In summary, we agree with the parties that the trial court erred in instructing the jury on first degree premeditated murder based on the natural and probable consequences doctrine. We conclude that there was instructional error under both natural and probable consequences theories – – that Weisner and Blackshire could be liable as aiders and abettors in the robbery and that they could be liable as conspirators in the commission of robbery, the target crime.

c. *Harmless Error*

Having found instructional error, we turn to whether such errors were harmless. In this context, the harmless error standard is whether it can be established "beyond a reasonable doubt that the jury based its verdict on [a] legally valid theory[.]" (*Chiu, supra*, at p. 167.)[9]

In *Chiu*, the instructional error clearly was not harmless. The court held "reversal is required unless there is a basis in the record to find that the verdict was based on a valid legal ground." (*Ibid*.) This was not the case in *Chiu*. The jury's questions reflected that the jury initially was deadlocked on whether the defendant should be found guilty of first or second degree murder. Further, a holdout juror specifically expressed difficulty with the aiding and abetting principle and with "putting an aider and abettor in the shoes of a perpetrator." Upon removal of that juror, the jury found the defendant guilty of first degree murder. (*Id*. at pp. 167-168) The court in *Chiu* found these factors "indicate[d] that the jury may have been focusing on the natural and probable consequence theory of aiding and abetting and that the holdout juror prevented a unanimous verdict on first degree premeditated murder based on that theory." (*Id*. at p. 168.) Accordingly, the court could not conclude "beyond a reasonable doubt that the jury ultimately based its first degree murder verdict on a different theory, i.e., the legally valid theory that defendant directly aided and abetted the murder." (*Ibid*.)[10] The Chiu court expressly concluded its holding does "not affect or limit an aider and abettor's liability for first

___

[9] In *People v. Guiton* (1993) 4 Cal.4th 1116, 1130 (*Guiton*), after noting the general rule is to reverse the conviction where "the appellate court is "'unable to determine which of the prosecution's theories served as the basis for the jury's verdict,'" our Supreme Court concluded an error is harmless when "it is possible to determine from other portions of the verdict that the jury necessarily found the defendant guilty on a proper theory. [Citations.]" The Court further concluded: "There may be additional ways by which a court can determine that error . . . , is harmless. We leave the question to future cases." (*Id*. at p. 1131.)

[10] The court in *Chiu* concluded the appropriate disposition was to remand the matter to allow the People to either accept a reduction of the first degree murder conviction to second degree or to retry the first degree murder charge based on any "valid theory."

35

degree felony murder under section 189." (*Id*. at p. 166.)

Neither *Chiu* nor *Rivera* involved the situation here, where the trial court instructed the jury on the theory of first degree murder under the felony murder theory. The *Chiu* court stated that "[a]n aider and abettor's liability for murder under the natural and probable consequences doctrine operates independently of the felony-murder rule. [Citation.]" It expressly concluded its holding does "not affect or limit an aider and abettor's liability for first degree felony murder under section 189." (*Id*. at p. 166.)

The record is silent as to whether the jury focused on the theory of felony murder or the natural and probable consequences doctrine in finding Weisner and Blackshire guilty of first degree murder. Although the prosecutor emphasized the felony murder liability option in closing argument, he also encouraged the jury to consider all theories.[11]

---

[11] In pertinent part, the prosecutor argued: "[A]t the beginning of this case in opening statements, I went through some of the laws on murder and how they apply to the defendants. One of those, if you recall, was referring to . . . . Wellington and Blackshire, [as] coconspirators, direct aiders and abettors, [and referring to the] natural and probable consequences[, and as to] Weisner, conspirator, aider and abettor, and [under] the natural and probable consequences [theory]. The court has given you, essentially, the laws on murder. In other words, the laws that someone can be guilty of murder as it relates to this case. And there is an idiom, a phrase which is sometimes use[d], it's all roads lead to Rome. And basically, what that means is.. everything goes toward the same result . . . . [I]n this particular case, what it means is that all of those legal theories, all of the law as it relates to murder, leads to first degree murder. And, . . . there are a number of them, and I will tell you, I will talk about some of them briefly, and *I encourage you if you want to go through all of them*, but I will focus on one which this case clearly fits."

After arguing that the theory of conspiracy based on the natural and probable consequences doctrine applied to the facts in this case, the prosecutor argued about first degree premeditated murder, including the requirements of "deliberation and premeditation[.]" The prosecutor advised "you don't have to go through all of these analysis." He added there is also the theory of aiding and abetting the robbery, the natural and probable consequences in the killing of the security guard. He then advised the jury: "[If] you want to go through all of those legal theories, the law on murder, you can, *and I encourage you to,* but you can also apply the law which clearly fits which is felony murder. Felony murder basically means they went out to commit a robbery and someone died. They're guilty of first degree murder." (Italics added.) After stating the judge would instruct the jury on the elements of felony murder, the prosecutor then

The issue here is whether instruction on invalid theories of first degree murder liability is harmless error where the jury was instructed on an alternative valid theory, i.e. felony murder, and the verdict established that the jury necessarily found true all the elements of that valid theory. It is uncontroverted that Quinones was murdered during the commission of a robbery, and that the crimes took place at the same location. The jury returned guilty verdicts as to Wellington, Weisner, and Blackshire on count two, which charged each with conspiracy to commit a crime, i.e., robbery, and on count three, robbery. Although the jury was instructed on first degree murder based on incorrect recitals of law, the jury also was instructed on a valid theory (felony murder) that reflected a correct statement of the law. The record establishes that the jury necessarily found Weisner and Blackshire, who were not the actual perpetrators, guilty on the valid felony-murder theory. Therefore, beyond a reasonable doubt, the error in the instructions on the invalid theories of first degree murder is harmless. The jury's guilty verdicts on the crimes of robbery and conspiracy to commit robbery, establish, as a matter of law, that Weisner and Blackshire were guilty of first degree felony murder.

7. *Cumulative Effect of Errors Claimed De Minimis*

Appellants contend the cumulative effect of the assigned errors was prejudicial and necessitates reversal of their respective judgments of conviction. (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32 [cumulative effect of errors individually harmless may be prejudicial].) We disagree. The cumulative effect of the established errors is de minimis.

A. *Sentencing Issues*

1. *Denial of Continuance Regarding Sentencing Not Abuse*

Blackshire and Wellington contend the trial court abused its discretion in denying their respective motions for a continuance. We find no abuse of discretion in its decision.

On July 30, 2013, sentencing was set for August 29, 2013 pursuant to agreement

---

argued how that theory applied in this case. Afterward, he argued that Weisner and Blackshire were aiders and abettors, pointing out Weisner "helped find . . . Quinones" and Blackshire exited the car "with his own gun."

of the parties. On August 23, 2013, Wellington's counsel made a motion to continue the hearing for sentencing and a motion for new trial "to a mutually convenient future date," because he needed additional time to file the new trial motions. Thomas Byrnes, Wellington's lead counsel, declared he had been engaged in other criminal matters and was unable to work full-time for the past several weeks due to health problems and that his cocounsel, Mojan Aghai, was engaged in another ongoing criminal trial. In denying the motion that same date, the trial court invited counsel to make an oral motion for new trial on the date for sentencing.

On August 28, 2013, Blackshire's counsel made a motion to continue sentencing until at least September 22, 2013 and an ex parte request for appointment and funding of a psychiatrist. He wanted a psychiatrist to meet with Blackshire and determine whether potentially mitigating circumstances for sentencing existed. Noting the motion to continue was faxed to the court at 2:00 p.m. on August 28, 2013, the trial court denied the continuance motion on the same day as untimely and denied the ex parte request for a psychiatrist as both untimely and unmeritorious.

Weisner and Blackshire had filed written motions for a new trial. The court allowed Wellington to make an oral new trial motion at the sentencing hearing.

On August 29, 2013, the matter was called for hearing on the motions for a new trial and for sentencing. In reference to denial of his continuance motion, Wellington's counsel asked "what's the rush?" The court expressed its concern for the victim's family in "stretching these cases out unduly," noting the family already had gone through two trials and had attended every day the court was in session, and needed closure. The court stated its view that it was unfair to continue sentencing and the motions at the last moment when all counsel had agreed to that day's date. The court noted that "counsel should stick to their word when we schedule something and we go forward." The court noted that although Mr. Byrnes had experienced health issues, the court had appointed Mojan Aghai to assist him in this case; the court had requested an extraordinary amount of money for this "single incident murder" to make sure the case was tried; and although Mr. Byrnes was doing "a good job" for Wellington, "we've got to have an end to these

38

things."

When Wellington's counsel argued the trial court had "short-circuited" the defense, the court responded in light of its experience in trying 267 murder cases, this trial should not have lasted three-and-a-half weeks and that the length of the trial was due primarily to counsel's defense and cross-examination, for which the court had given him "all the time [he] needed."

Blackshire's counsel noted he also had been ill. Although prepared to argue his new trial motion, he stated he also had made a continuance motion to hire a psychiatrist to point out matters in sentence mitigation. The court responded the motion was filed by fax at 2:00 p.m. the day before the sentencing hearing. Counsel then sought to postpone sentencing for three weeks to address new cases regarding juvenile sentencing, including *People v. Caballero* (2012) 55 Cal.4th 262, 268 (*Caballero*) and argued for a three week continuance for appointment of a psychiatrist.[12] The court denied this oral motion as untimely.[13] After counsel for Wellington and Blackshire argued their respective new trial motions, the court denied the motions.

A written notice of motion for a continuance in a criminal matter "shall be filed and served on all parties to the proceeding at least two court days before the hearing sought to be continued[.]" (§ 1050, subd. (b).) Although a party may make a continuance motion without complying with this requirement, a continuance "shall be granted only upon a showing of good cause" following a hearing and "[a] continuance shall be granted only for that period of time shown to be necessary by the evidence

---

[12] Wellington's attorney joined in the motion for continuance, which the court denied.

[13] In arguing Blackshire's motion for a new trial, counsel expressed concern about whether the jury had considered improper information despite the court's instruction to the contrary and hoped the court would grant the requested continuance to enable his investigator to contact the jurors regarding this issue. The court was not persuaded a continuance would be appropriate, explaining the court already had denied his motion for juror information as "extremely late" and made without good cause.

considered at the hearing on the motion." (§1050, subds. (d), (e) & (h)(i).)

"'The trial court's denial of a motion for continuance is reviewed for abuse of discretion.' [Citation.] 'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' [Citations.] In reviewing the decision to deny a continuance, '[o]ne factor to consider is whether a continuance would be useful. [Citation.]' [Citation.]" (*People v. Mungia* (2008) 44 Cal.4th 1101, 1118.) Moreover, """"a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the laws applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." [Citation]' [Citation.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 976.)

The record does not reflect the trial court gave a reason for denying Wellington's continuance motion on August 23, 2013. However, at the August 29, 2013, hearing, when Wellington's counsel brought up the subject, the trial court explained that all counsel had agreed to this date for sentencing; the victim's family needed closure rather than drawing out the proceeding unduly; and "this trial should not have lasted three-and-a-half weeks." The court, having tried 267 murder trials, considered that "excessively long[.]"

The court did not abuse its discretion in denying Wellington's continuance motion. The legislature has determined that: "The welfare of the people of the State of California requires that all proceedings in criminal cases shall be set for trial and heard and determined at the earliest possible time," because, among other reasons, "[e]xcessive continuances . . . cause substantial hardship to victims[.]" (§1050, subd. (a).)

Although the trial court denied Blackshire's continuance motion for appointment of a psychiatrist on August 28, 2013 as untimely, the court also impliedly denied the motion for lack of good cause, because the court denied his related request for a psychiatrist as unmeritorious. In his written motion, Blackshire's counsel speculated that

40

Blackshire "may have had some history of mental infirmity in his background and[/]or psychological and or educational dysfunction that may have contributed to his conduct in this case," and he sought "a report and the assistance of a trained psychiatric professional to assist counsel in determining if said condition[s] could provide evidence that might mitigate or explain his conduct to assist the court."

At the August 28, 2013 hearing, Blackshire's counsel presented no evidence demonstrating a psychiatric examination would produce potentially mitigating circumstances affecting Blackshire's sentence. A request for continuance without sufficient foundation does not constitute good cause for a continuance. The court did not abuse its discretion by denying Blackshire's request for a continuance.

Denial of Blackshire's continuance motion made on the day of sentencing also was not an abuse of discretion. Blackshire's counsel gave no reason, much less a compelling one, why, prior to this hearing date, he could not have addressed the recent cases on juvenile sentencing and moved for appointment of a psychiatrist. Failure to demonstrate due diligence undercuts a claim of good cause for a continuance. (*People v. Howard* (1992) 1 Cal.4th 1132, 1171.)

2. *The Sentences of 50 Years to Life Do Not Violate the Eighth Amendment*

Wellington and Blackshire contend their respective sentences of 50 years to life for their murder convictions and firearm enhancement amount to a sentence of life without possibility of parole, which is cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution (Eighth Amendment), because each was a juvenile when the crimes were committed. We find no constitutional infirmity. The sentences are not the prohibited "functional equivalent of life without parole" (*Caballero, supra*, 55 Cal.4th at p. 268) because pursuant to section 3051, Wellington and Blackshire each will be entitled to a parole hearing on the 25th year of his incarceration, at which time each will be age 42.

41

Wellington and Blackshire were charged with and convicted of first degree murder. Both were juveniles when they committed the crime. Wellington was "155 days shy of his 18th birthday," and Blackshire was 40 days "short" of his eighteenth birthday.

Section 190, subd. (a) provides that "every person guilty of murder in the first degree shall be punished by death, imprisonment in the state prison for life without the possibility of parole, or imprisonment in the state prison for a term of 25 years to life." The minimum sentence for first degree murder is therefore 25 years to life. Further, the mandatory penalty for the firearm enhancement here is "an additional and consecutive term of . . . 25 years to life." (§ 12022.53, subd. (d).) Taken together, these statutes required the trial court to impose a sentence of at least 50 years to life on Wellington and Blackshire. Whether a minimum statutorily mandated sentence of 50 years to life arising from a murder committed by a defendant age 17 violates the Eighth Amendment is currently pending before our Supreme Court. (*People v. Jordan* (S225848) ~rev. grant July 8, 2015 [formerly, (2015) 235 Cal.App.4th 198~.)

The jurisprudence addressing Eighth Amendment issues stemming from the sentencing of juveniles has evolved in recent years. In *Roper v. Simmons* (2005) 543 U.S. 551, 578, the United States Supreme Court held that the Eighth Amendment prohibits the imposition of the death penalty on juvenile offenders. In *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), the Supreme Court held the Eighth Amendment prohibits imposition of a life without the possibility of parole sentence on a juvenile for any crime other than homicide. In *Miller v. Alabama* (2012) 567 U.S ____ [132 S.Ct. 2455] (*Miller*), the Supreme Court held although states are proscribed from imposing "mandatory life without possibility of parole sentences for juveniles" as a general rule, states may impose a sentence of life without possibility of parole on juveniles convicted of murder following "individualized sentencing" that takes into account various factors reflecting "how children are different," e.g., the defendant's background and age, and whether the defendant was the "'rare juvenile offender whose crime reflects irreparable corruption.'" [Citations.] (*Id.* at p. 2469.) *Caballero*, which was not a homicide case, concerned the imposition of a sentence of 110 years to life on a defendant convicted of

attempted murder when he was 16 years old and would not be eligible for parole for over 100 years. (*Caballero, supra*, at pp. 265, 268-269.) *Caballero* interpreted *Miller* as standing for the proposition that the bar in *Graham* applies to "all *nonhomicide* cases involving juvenile offenders, including the *term-of-years sentence that amounts to the functional equivalent of a* [life without possibility of parole] *sentence*[.]" (*Caballero, supra*, at p. 268, italics added.)

This line of cases prohibited the trial court from imposing a sentence of death (*Roper*) and from imposing a sentence of life without the possibility of parole without considering various factors reflecting "how children are different" (*Miller*). In this case the court imposed the mandatory minimum sentence of 50 years to life, which it found warranted because Wellington and Blackshire were the shooters, volunteered to commit the robbery, and were "extremely committed to the gang lifestyle." The court also found that the killing of the victim was "unnecessary and gratuitous," and appeared to be "more in the nature of a thrill kill." It further concluded that both Wellington and Blackshire should be considered to be "within that rare group of juvenile offenders whose crimes reflect irreparable corruption."

In *Caballero,* the court urged the Legislature "to enact legislation establishing a parole eligibility mechanism that provides a defendant serving a de facto life sentence without possibility of parole for nonhomicide crimes that he or she committed as a juvenile with the opportunity to obtain release on a showing of rehabilitation and maturity." (*Id*. at p. 269, fn 5.) Heeding the court's plea, the Legislature enacted Senate Bill No. 260, codified as section 3051. It provides a juvenile offender, without limitation to nonhomicide crimes, with a "meaningful opportunity to obtain release" by requiring the Board of Parole Hearings (Board) to conduct a "youth offender parole hearing" to consider release. (§ 3051, subds. (a)(1) & (d).)

Under section 3051, a defendant sentenced to 25 years to life for a "controlling offense" committed before age 18 is entitled to receive a youth offender parole hearing after 25 years of incarceration. (§ 3051, subd. (b)(3).) A "'[c]ontrolling offense'" is defined as "the offense or enhancement for which any sentencing court imposed the

43

longest term of imprisonment." (§ 3051, subd. (a)(2)(B).) Ordinarily, a defendant whose sentence is simply 25 years to life is entitled an opportunity for parole after 25 years of incarceration. The mandatory parole opportunity under section 3051 therefore is significant only in situations such as this, where a defendant is sentenced to serve a minimum term greater than 25 years. As we have noted, Wellington and Blackshire will be eligible for such hearings when they are 42 years old.

The Courts of Appeal are divided as to whether the hearing required by section 3051 is sufficient to satisfy the requirements of *Miller*, *Graham*, and *Caballero* such that challenges such as those raised by Wellington and Blackshire are moot. The Supreme Court has granted review in various cases but has not yet resolved the issue. (See *In re Alatriste* (S214652); *In re Bonilla* (S214960); see also, *People v. Gonzales* (S219167); *People v. Garrett* (S220271); *People v. Saetern* (S220790); and *People v. Hernandez*, (S224383).)

We agree with the analysis of those decisions holding that the procedures established by section 3051 comply with Eighth Amendment requirements. We accordingly conclude that even if the 50 years to life sentence imposed on Wellington and Blackshire is the functional equivalent of a life without parole sentence for a juvenile convicted of homicide, section 3051 ensures that Wellington and Blackshire will not in fact face the functional equivalent of life without the possibility of parole. Neither is entitled to a new sentencing hearing under *Miller* or remand under *Caballero* to determine the time for parole eligibility.

## DISPOSITION

The judgments are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:

44

EPSTEIN, P. J.


WILLHITE, J.